AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Central District of Illinois

In the Matter of the Search of

*(Briefly describe the property to be searched*
*or identify the person by name and address)*

RESIDENCE LOCATED AT 1732 GLEASON DRIVE
RANTOUL, IL 61866, (Kejuan COLEMAN), more particular described
as a a single-story residence with yellow and green siding

)
)
)
)
)
)

Case No. 24-MJ- 7047

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, which is attached hereto and incorporated by reference.

located in the _____ Central _____ District of _____ Illinois _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, which is attached hereto and incorporated by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Unlawful Distribution of Controlled Substances, |
| 21 U.S.C. § 846 | Attempt or Conspiracy to Unlawfully Distribute Controlled Substances, |
| 21 U.S.C. § 843(b) | Use of communication facilities to facilitate drug-trafficking offenses |

The application is based on these facts:

See Affidavit of Special Agent Matt Nolan, DEA attached hereto and incorporated herein by reference.

☑ Continued on the attached sheet.

☑ Delayed notice of __30__ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

MATTHEW NOLAN Digitally signed by MATTHEW NOLAN
Date: 2024.03.18 13:50:38 -05'00'

*Applicant's  signature*

Special Agent Matt Nolan, DEA

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ electronic mail and telephone _____ *(specify reliable electronic means).*

Date: ___3/19/2024___

s/ Eric I Long

City and state:  Urbana, Illinois

Eric I. Long, Magistrate Judge

*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF:<br>**RESIDENCES LOCATED AT 1732 GLEASON DRIVE RANTOUL, IL 61866, (Kejuan COLEMAN); 801 EASTVIEW DRIVE, RANTOUL, IL 61866 (Chase SELLERS); 1432 FAIRWAY DRIVE, RANTOUL, IL 61866 (Dequan FEDERSON); 2592 WEST SPRINGFIELD AVE, CHAMPAIGN, IL 61821 (Trayon PARKER); 2142 MONROE DRIVE, URBANA, IL 61802 (Eric COLE); 1207 MASON CIRCLE, URBANA, IL 61802 (Martinez BRADLEY); 507 WEST WHITE STREET, APT. 13, CHAMPAIGN, IL 61820 (Michael GIPSON); 114 SCOTTSWOOD DRIVE, URBANA, IL 61802 (Deshante INGRAM); EACH PARCEL MORE PARTICULARLY DESCRIBED ON EXHIBITS A HERETO** | Case No. 24-MJ- 7047 |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Matthew T. Nolan, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the **SUBJECT RESIDENCES**, associated to and utilized by the More Than A Movie (MTAM) Enterprise as further identified and described in this affidavit and also in Attachment A, for the things described in Attachment B. As explained herein, there is probable cause to believe that the MTAM Enterprise is a Drug Trafficking Organization (DTO) and Violent Street Gang operating throughout the Continental United States to include, Texas, Georgia, and Central Illinois to include the cities of Champaign, Urbana, and Rantoul. A search of the **SUBJECT RESIDENCES** will result in the discovery of evidence of violations committed by KEJUAN COLEMAN, CHASE SELLERS, MARTINEZ BRADLEY, DEQUAN FENDERSON, TRAYON PARKER, ERIC COLE, DESHANTE

INGRAM, and MICHAEL GIPSON (collectively, the "**VIOLATORS**") who have committed, are committing, and will continue to commit the following offenses: (1) Title 21 United States Code, Section 841(a)(1), Unlawful Distribution of Controlled Substances,  (2) Title 21, United States Code, Section 846, Attempt or Conspiracy to Unlawfully Distribute Controlled Substances, (3) Title 21, United States Code 843(b) use of communication facilities to facilitate drug-trafficking offenses  hereinafter collectively, the "**SUBJECT OFFENSES**".

      **2.**      I am a Special Agent with the Drug Enforcement Administration (DEA), and have been since April of 2019. Prior to my employment with the DEA, I served in the State of Minnesota as a Law Enforcement Officer from August 2011 through April of 2019 when I was hired by DEA. I have participated in numerous investigations of unlawful drug distribution and have conducted or participated in surveillances, the execution of search warrants, the recovery of substantial quantities of narcotics, narcotics paraphernalia, drug proceeds, and the debriefings of informants and cooperating witnesses. Through my training, education, and experience, I have become familiar with the manner in which illegal drugs are transported, stored, and distributed, the possession and use of firearms in connection with trafficking of such drugs, and the methods by which narcotics traffickers store and conceal the proceeds of their illegal activities.

      **3.**      I have successfully completed training sponsored by the Drug Enforcement Administration dealing with search and seizure warrants, enforcement of state and federal drug laws, and the identification of controlled substances. I have also received training in surveillance, counter-surveillance, smuggling of drugs and laundering of drug proceeds.

      **4.**      I have acted as an affiant on multiple prior applications for the installation of the mobile tracking devices and real time geo-location information in relation to drug trafficking organizations and their members. I have acted as an affiant on prior applications for the interception of wire and electronic communications. I have served as a monitor, a member of the

surveillance team, and have listened to intercepted phone calls between individuals identified as suspected narcotics traffickers.

5.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

6.      Based on my training, experience, and the facts as set forth in this affidavit, there is probable cause to believe that the above-mentioned **SUBJECT OFFENSES**, have been committed, are being committed, and will continue to be committed by the **VIOLATORS**. There is also probable cause to search the **SUBJECT RESIDENCES** further described in Attachment A, for evidence of these crimes and items to be seized listed in Attachment B.

## THE MORE THAN A MOVIE (MTAM) ENTERPRISE, DRUG TRAFFICKING ORGANIZATION AND VIOLENT STREET GANG AND BACKGROUND OF INVESTIGATION

7.      The proposed warrant is sought as part of an investigation into the MTAM Enterprise which is a Drug Trafficking Organization (DTO) and Violent Street Gang.

8.      Beginning in March 2022, the DEA Springfield Resident Office (SRO) Agents, in conjunction with local law enforcement, began investigating Anthony FLYNN who was a retail distributor of Oxycodone pills, other pharmaceuticals, and illicit narcotics in the Rantoul, Illinois area. Agents received a Champaign County Crime Stoppers tip which reported FLYNN was reported to be actively selling "Perk 30s" which are laced with Fentanyl in the Rantoul, Illinois area. Since the initiation of the investigation, FLYNN was identified as a member of the MTAM Enterprise Drug Trafficking Organization (DTO) and Violent Street Gang.

9.      During the month of November 2022, FLYNN was arrested on State of Illinois charges related to firearm and drug related offenses and has since been sentenced on his State of

Illinois charges. Through interviews of confidential sources, reviewing of local police reports, and reviewing State of Illinois search warrants investigators have learned multiple members of the MTAM Street Gang are involved with the acquisition and sale of "Perk 30s", other pharmaceuticals, and other controlled substances. Additionally, MTAM members have been involved or associated with multiple acts of violence within the Champaign, Urbana, and Rantoul areas. Since FLYNN's arrest and sentencing, agents have learned that several of FLYNN's associates in MTAM have filled his organizational role of selling various illicit narcotics and pharmaceuticals, to include cocaine, fentanyl pills, promethazine with codeine, alprazolam, as well as acquiring and selling firearms for MTAM.

10.     Subsequent to Flynn's arrest, a State of Illinois, Champaign County court authorized search warrant was executed for Flynn's cellular telephone. The subsequent search and analysis of text, picture, call logs, social media, and other various stored data revealed Flynn and multiple other members of the MTAM Enterprise Drug Trafficking Organization (DTO) and Violent Street Gang, were actively involved in the acquisition and distribution of both illicit and pharmaceutical narcotics, along with the acquisition and trafficking of more than 30 firearms. Information from this search warrant suggested many of these firearms were trafficked from Missouri to Illinois where they were possessed and utilized by the MTAM Enterprise Drug Trafficking Organization (DTO) and Violent Street Gang.

11.     During the month of April 2023, law enforcement cultivated a Rantoul PD Confidential Source (CS) who has been deemed reliable and credible. The Rantoul CS is providing information and cooperation to Law Enforcement for consideration on pending State of Illinois theft and driving related offenses. Additionally, a review of The Rantoul CS's criminal history showed two felony convictions for theft, multiple misdemeanor convictions for deceptive practice, driving offenses, and DUI.  The Rantoul CS (hereafter referred to as "the CS") identified multiple members of the MTAM Enterprise Drug Trafficking Organization (DTO) and

Violent Street Gang, some of whom the CS could purchase controlled substances from.  The CS identified known MTAM Enterprise Drug Trafficking Organization (DTO) and Violent Street Gang members as: Anthony Flynn, Trayon Parker, Kejuan Coleman, Dequan Fenderson, Chase Sellers, Dequanta Wooten, Johnny Jones, Dontae Robinson, Jheremiah McKown, Martinez Bradley, Malik Jones, Deshante Ingram, Eric Cole, and others.

      **12.**    During the months of May, June, and July 2023, Investigators utilized both the CS and an Undercover Officer, hereafter referred to as UC-1, to complete multiple controlled purchases of both illicit narcotics and controlled pharmaceuticals from identified MTAM DTO and Violent Street Gang member Trayon Parker.

      **13.**    During the month of June 2023, a review of financial information revealed organization member Wooten was responsible for cash withdrawals exceeding $10,000 and members Coleman and Sellers, along with an associate identified as Emiyah Brooks were responsible for the movement of over $725,000 between February 2022 and March 2023 via app-based platforms.

      **14.**    On July 13, 2023, investigators issued a Grand Jury Subpoena to Instagram related to multiple MTAM Enterprise Drug Trafficking Organization (DTO) and Violent Street Gang members accounts.

      **15.**    On July 17, 2023, a response from Instagram was received.  The response identified multiple MTAM Enterprise Drug Trafficking Organization (DTO) and Violent Street Gang members accounts as follows:

| Instagram Username | Name | Email Address | Registration Date |
|---|---|---|---|
| 1mtamwop | Wop Deshawn | dequanfenderson1220@icloud.com | 11/12/2020 |
| mtam_5ive | ⸜ⱦ A Ⓜ 5ive | N/A | 8/2/2020 |
| mtam_beastmoe500 | Mtam Skezzy | parkertrayon@yahoo.com | 8/6/2020 |
| mtam_chubss | ⸜ⱦ A Ⓜ Chubbs | sellerschase4@gmail.com | 5/5/2013 |
| mtam_jones | N/A | j.johnny1823@yahoo.com | 6/8/2012 |
| mtam_liltae | The influence 🐆 | dontaeboi928@gmail.com | 6/23/2013 |

| mtam_nez | Mtam Nez | martinezbradley04@yahoo.com | 11/1/2012 |
|---|---|---|---|
| mtam_slutty | Numba7teen | 2018malikjones@gmail.com | 6/16/2014 |
| mtam_tadoe | N/A | taeingram22@gmail.com | 5/10/2017 |
| mtammulla | PainReal ⬦ | ericcole24@icloud.com | 3/6/2016 |
| on3kidd | MTAM_On3Kidd | kejuancoleman12@yahoo.com | 12/26/2012 |

16.     During the month of August 2023, DEA Agents in Illinois were contacted by DEA Agents based in Fort Worth, Texas, and advised two couriers (hereafter referred to as CD-1 and CD2) were arranging transport of approximately 10,000 M/30 pills from Illinois to Fort Worth, TX.  Further, the Agents in Fort Worth, TX provided information the source arranging transportation of the pills was PARKER who was utilizing the same cellular telephone number the UC had contacted PARKER at to complete the above-mentioned controlled purchases.  Ultimately CD-1 and CD2 completed the delivery of the approximately 10,000 M/30 pills to a DEA UC in Fort Worth, TX.  The total combined weight of the suspected M/30s was approximately 1,118.2 grams and tested positive for the presence of Fentanyl.

17.     Agent's/Investigators from the Springfield, IL DEA Office travelled to Fort Worth, TX to interview CD-1 and CD2.  Agent's/Investigators spoke with CD-1 and CD2 independently and neither CD-1 or CD2 were allowed to speak with the other prior to speaking with investigators.  Additionally, both CD-1 and CD2 had their respective Defense Counsel present with them while speaking with investigators.  CD-1 and CD2 began providing information to investigators subsequent to their arrest in hopes of receiving leniency and consideration on pending federal drug charges related to this arrest.  The information, as detailed below, provided by CD-1 and CD2 was independently verified and corroborated by Investigators through the analysis of court authorized vehicle tracker data, toll records analysis, and prior Law Enforcement contacts with individuals/addresses.  A review of CD-1's criminal history showed no prior arrests or convictions prior to CD-1's arrest for this incident.  A review of CD2's

criminal history showed prior felony convictions for Aggravated DUI and Aggravated

Battery/Peace Officer.

18.     CD-1 stated the events leading up to this interview began approximately one and

a half weeks prior when PARKER asked CD-1 if CD-1 would be interested in taking a trip to

Fort Worth, Texas. CD-1 further explained PARKER asked CD-1 what CD-1 would charge

PARKER to make the trip but nothing pertaining to payment was discussed after this initial

inquiry. CD-1 stated CD-1 felt a loyalty to PARKER and agreed to make the trip to Texas for

him.

19.     CD-1 stated PARKER paid for a new tire and an oil change for CD-1's car and

also paid to have CD-1's car detailed prior to the trip. CD-1 also stated PARKER bought two

used tires, at this time, for PARKER's Cadillac. CD-1 also mentioned CD-1 drove PARKER's

Cadillac around town on July 31, 2023.

20.     CD-1 stated CD-1, driving PARKER's Cadillac, followed PARKER, who was

driving CD-1's vehicle, on July 31, 2023, to pick up 10,000 pills from a location in Rantoul,

Illinois. CD-1 said this took place between 8:30 pm – 11:00 pm. CD-1 stated CD-1 and

PARKER went to a house near Golfview Village where PARKER's child's mother lives with an

individual named "Wop". The residence CD-1 described is known to investigators as being

located at 1432 Fairway Drive, Rantoul, Illinois. The individual known as "Wop" has previously

been identified by investigators as Dequan FENDERSON.  CD-1 stated CD-1 was instructed, by

PARKER, to wait down the street from the house while PARKER went to the house to obtain the

pills. CD-1 stated PARKER went inside the house to get the pills. CD-1 mentioned one of

PARKER's children lives at the residence they visited on July 31, 2023.

21.     CD-1 stated PARKER provided an address via text of where to meet someone

who would take the pills on August 2, 2023.

22.     CD-1 further provided information that CD-1 met an individual known as "ONE3KIDD" through PARKER. "ON3KIDD" is the known alias of COLEMAN and has previously been identified as the alias utilized by COLEMAN throughout this ongoing investigation.  CD-1 further stated COLEMAN lives in Rantoul, Illinois, and is a supplier of marijuana and pills. CD-1 also stated COLEMAN breeds canines for profit. CD-1 was shown Google Maps and was able to identify the house where COLEMAN lives. CD-1 identified 1732 Gleason Drive, Rantoul, Illinois, as COLEMAN's house.

23.     Additionally, CD-1 had personally seen multiple members to have MTAM tattooed on themselves.

24.     CD2 stated that PARKER told CD2 that PARKER would compensate CD2 with drugs and money if CD2 accompanied CD-1 to Fort Worth, Texas, to deliver pills for PARKER.

25.     CD2 stated PARKER had been talking about the trip to Fort Worth, Texas, for two or three days prior to their departure in order to "bait" CD2 into agreeing to participate.

26.     CD2 stated his role during the trip was to be CD-1's "co-pilot". CD2 further stated CD2 was told the pills were in the vehicle but did not see them himself. CD2 also said PARKER told CD2 the pills were "Perc 30's" and CD2 believed this to mean they were legitimate Oxycodone pills. CD2 stated he and CD-1 were told to pick up $20,000 in exchange for the pills in Fort Worth, Texas.

27.     During the month of October 2023, Source of Information (hereafter referred to as "the SOI") with knowledge of this investigation contacted Agents/Investigators and related the SOI had the ability to establish communication with COLEMAN.  The SOI has previously been deemed reliable and credible.  The SOI has previously provided information to the DEA which has led to the seizures of substantial quantities of narcotics and lead to the arrests of multiple drug traffickers.  The SOI is providing information to Investigators of their own free will and is not receiving compensation or consideration on any pending charges at this time.  A review of

the SOI's criminal history showed one prior Federal Felony drug conviction.  Additionally, the SOI's criminal history showed State of Arizona felony convictions for Assist Criminal Syndicate/Lead Gang and Threat-Intimidate-Gang, along with State of Arizona misdemeanors for driving related offenses.  The SOI further related the SOI was provided with the telephone number of (773-706-8770) to contact COLEMAN on.

28.     Later during the month of October, an Undercover Agent, hereafter referred to as UC-2, established contact with Kejuan COLEMAN via COLEMAN's cellular telephone ending in x8770, utilizing a covert, monitored and recorded phone line.  The SOI had previously provided the x8770 number to UC-2.  Additionally, the SOI related to COLEMAN that an individual (UC-2) would contact COLEMAN.  During this communication UC-2 spoke with COLEMAN about acquiring a sample of "Perk 30s", suspected oxycodone.  COLEMAN agreed to meet UC-2 on a later date to provide the sample of "Perk 30s".

29.     Approximately 1 week later UC-2 placed an outgoing call to COLEMAN.  During the call COLEMAN agreed to meet the UC-2 the following day at the Blain's Farm & Fleet in Urbana, located at 2701 N Cunningham Ave, Urbana, IL 61802, to provide the previously agreed upon sample of "Perk 30s".

30.     The following day UC-2 sent a text to COLEMAN advising the UC would arrive at the agreed upon meet location at about 1:00pm.  COLEMAN responded affirmatively.  Later that day UC-2 was provided the sample of "Perk 30s" by COLEMAN's associate and co-conspirator, Martinez BRADLEY who was previously known to investigators as a known MTAM member and associate of COLEMAN.

31.     During the month of November 2023, UC-2 again contacted COLEMAN via the x8770 number to purchase an additional quantity of "Perk 30s" along with Promethazine with Codeine cough syrup referred to as "Drank".  This transaction was again delivered to UC-2 by BRADLEY who was driven to this transaction by Michael GIPSON operating a silver Chevrolet

9

Malibu bearing Illinois registration DU61074.  A check through the Illinois Department of Transportation showed the vehicle is registered to Michael GIPSON to 1302 Christopher Circle Apt. 4, Urbana, Illinois 61802.  GIPSON has previously been identified during this investigation and is a known member of MTAM.  GIPSON was later identified as the driver of the vehicle when Investigators showed UC-2 a law enforcement image of Michael GIPSON (GIPSON) with identifiers hidden. UC2 positively identified GIPSON as the male driver.

32.     During the month of December 2023, UC-2 again contacted COLEMAN via the x8770 number to purchase an additional quantity of "Perk 30s" along with Promethazine with Codeine cough syrup referred to as "Drank".  Ultimately UC-2, through communications with COLEMAN, again completed the controlled purchase which was delivered to UC-2 by BRADLEY.  During this controlled purchase, UC-2 observed BRADLEY exit from and return to a Porsche passenger vehicle bearing Illinois registration EJ33146. A check through the Illinois Department of Transportation showed the vehicle is registered to Johnny JONES to 1670 Harper Dr, Rantoul, Illinois 61866.  JONES has previously been identified in this investigation as a known MTAM member and associate of COLEMAN, BRADLEY, and multiple other MTAM members.  Additionally, during this controlled purchase UC-2 observed COLEMAN to be the driver of the Porsche.

33.     On January 30, 2024, The Honorable Colin S. Bruce, United States District Judge for the Central District of Illinois, signed an order authorizing the interception of wire communications occurring over cellular telephone number (773) 706-8770, utilized by COLEMAN.

34.     Since the initiation of the court authorized interception of wire communications occurring over COLEMAN's phone numerous commincations have been intercepted which show the **SUBJECT OFFENSES**, have been committed, are being committed, and will continue to be committed by the **VIOLATORS.**  As detailed further below, the **VIOLATORS** are

10

utilizing the **SUBJECT RESIDENCES** in furtherance of the **SUBJECT OFFENSES** to conceal narcotics, proceeds, documents, firearms and other items related to the continued operations of the MTAM Enterprise Drug Trafficking Organization (DTO) and Violent Street Gang.

## THE SUBJECT RESIDENCES

### 1732 GLEASON DRIVE
### RANTOUL, IL 61866
### (Kejuan COLEMAN)

**35.** Throughout this investigation 1732 Gleason Drive, Rantoul, IL 61866, has been identified as the residence utilized by Kejuan COLEMAN.

**36.** During investigators above mentioned interview with CD-1, CD-1 identified COLEMAN as a source of marijuana and pills.  CD-1 further identified 1732 Gleason Dr as COLEMAN's residence via Google Maps.

**37.** Additionally, on August 14, 2023, your affiant conducted surveillance of 1732 Gleason Dr.  During this surveillance you affiant observed COLEMAN standing in the driveway of 1732 Gleason Drive, Rantoul IL 61866.  COLEMAN was observed to be standing next to a Dodge Charger Hellcat bearing Illinois registration S1526763.  Both this vehicle and residence had previously been associated to COLEMAN by investigators through local police reports.

**38.** On February 3, 2024, Investigators monitored an intercepted communication between COLEMAN and Johnny JONES.  During this communication the following exchange took place:

- JONES: Hello?
- COLEMAN: Slide to my crib. Get you 2 of them things.
- JONES: You said what?
- COLEMAN: Go grab you 2 of them [U/I] things. [U/I].
- JONES: A'right.

39.     On February 14, 2024, Investigators monitored an intercepted communication between COLEMAN and SELLERS.  During this communication the following exchange took place:

- COLEMAN: Where you at?
- SELLERS: Just got to your crib, brody. Where you at?
- COLEMAN: You at my house?
- SELLERS: Yeah. Huh?
- COLEMAN: Who you with?
- SELLERS: NEZ.
- COLEMAN: Come to my house.
- SELLERS: I'm at your house.
- COLEMAN: At Pop's, I meant.
- SELLERS: Huh?
- COLEMAN: Come to my Pop's house.
- SELLERS: Come to your Pop's house?
- COLEMAN: Yeah.
- SELLERS: Okay.

40.     Investigators subsequently reviewed electronic surveillance of 1732 Gleason Dr. During this review it was observed that a vehicle pulled into the driveway.  Further it showed a black male, later confirmed to be BRADLEY, exit the front driver door of the vehicle. Additionally, it showed a white male, later confirmed to be SELLERS, exit the rear passenger side of the vehicle.  Both individuals approached the front door of 1732 Gleason before going inside.  A short time later, a yet to be identified female exited the front passenger seat and also entered the residence.  A short time later all three individuals exit the residence and depart.

41.     During the month of February 2024, investigators continued to monitor electronic surveillance of 1732 Gleason Dr.  This monitoring showed COLEMAN routinely coming and going from the residence.  It was revealed COLEMAN would enter and exit through the front door of the residence and did not knock or wait to be let in to the residence when coming or going.

42.     Based on the intercepted communications in conjunction with the monitoring of electronic surveillance for the residence it is apparent COLEMAN and the MTAM Enterprise,

12

are utilizing the residence in furtherance of the enterprises continued criminal conduct and a search of the residence would likely lead to the discovery of the MTAM Enterprises criminal activities to include:

    **a)**     Cellular telephones utilized by Kejuan COLEMAN.
    **b)**     Financial records indicating payments received.
    **c)**     Receipts for shipments of narcotics.
    **d)**     Items used to package narcotics for distribution via commercial shippers i.e. USPS, FedEx, UPS.

**801 EASTVIEW DRIVE**
**RANTOUL, IL 61866**
**(Chase SELLERS)**

**43.**    Throughout this investigation 801 Eastview Drive, Rantoul, IL 61866, has been identified as the residence utilized by Chase SELLERS.

**44.**    During this investigation, fellow MTAM member Dontae ROBINSON was arrested by local law enforcement subsequent to multiple controlled purchases of M/30 pills containing fentanyl and a search warrant being executed at ROBINSON's residence. Subsequent to ROBINSON's arrest and the execution of the search warrant, investigators located an Apple i-Phone which was seized from ROBINSON's person at the time of his arrest. On September 1, 2023 United States Magistrate Judge Eric I. Long issued a Federal Search Warrant, authorizing a search of the device. A subsequent forensic examination of the device was conducted and revealed numerous drug related conversation via text messages, to include conversation with COLEMAN. The following is a sampling of text messages between ROBINSON and COLEMAN from May 19, 2023:

- ROBINSON: Pulling up
- COLEMAN: I'm at chase house
- ROBINSON: U want me to get it there
- COLEMAN: Yeah
- ROBINSON: Send addy quick

13

- COLEMAN: 801 Eastview (The address of 801 Eastview Drive, Rantoul, IL is known by investigators to be the residence of MTAM member Chase SELLERS)

45. This text exchange seems to show that ROBINSON was acquiring an unknown substance from COLEMAN who directed ROBINSON to SELLERS residence to acquire the substance.

46. Additional reviews of text messages recovered from the device revealed text messages directly between ROBINSON and SELLERS discussing narcotics and firearms. The following is a sampling of text messages between ROBINSON and SELLERS from May 24, 2022:

- ROBINSON: Give my yercs to Wop
- ROBINSON: On yo table

47. This text exchange seems to show ROBINSON advising SELLERS that ROBINSON had left "yercs", known to investigators to be counterfeit pharmaceutical pills containing fentanyl, at SELLERS residence. ROBINSON further instructed SELLERS to give the pills to "Wop", identified throughout this investigation to be the alias of fellow MTAM member Dequan FENDERSON.

48. The following is another sampling of text messages between ROBINSON and SELLERS from July 4, 2022:

- ROBINSON: Lmk when back my pipe ova Thea
- SELLERS: Where it's at I thought you grabbed it
- ROBINSON: Onna side by the church
- ROBINSON: Couch
- SELLERS: Ight

49. This text exchange between ROBINSON and SELLERS appears to show ROBINSON advising SELLERS he left his "pipe" known by investigators to be a street term used to reference a firearm, at SELLERS residence next to the couch. SELLERS confirms to ROBINSON that SELLERS will let ROBINSON know when he returns to the residence.

50.     Additionally, through the monitoring of the court authorized interception of wire communications occurring over the cellular telephone utilized by COLEMAN, in excess of 50 pertinent calls have been intercepted between COLEMAN and SELLERS.

51.     During an intercepted communication from January 31, 2024, SELLERS and COLEMAN discussed FENDERSON bringing a quantity pills to SELLERS residence.  During this communication the following exchange took place:

- SELLERS: I just woke up. That fucking green knocked me the fuck out, bro.
- COLEMAN: [U/I] that ain't shit to [U/I], bro'.
- SELLERS: [Pause] [U/I] right here, right. No, but WOP [U/I] never bring me the pills.
- COLEMAN: That shit [U/I] in the house, bro. You don't even know they in there.
- SELLERS: No.
- COLEMAN: He left them in there, bro. [Audio Glitch] What are you talking 'bout?
- SELLERS: They at his house?
- COLEMAN: In your house.
- SELLERS: Oh.

52.     On Friday, March 8, 2024, SA Nolan placed a rouse call to telephone number to (217) 778-8407.  Through the review of law enforcement records and open-source databases this telephone number was identified as belonging to Russel BRYAN.  BRYAN is known by law enforcement to be the grandfather of SELLERS.

53.     Upon placing the call, a male voice answered the phone and identified himself as BRYAN.  During the call, SA Nolan stated a concerned citizen in the Village of Rantoul reported not seeing activity at the residence and the Village was calling to check on the residence.  SA Nolan further inquired into ownership and occupancy of the residence.  BRYAN stated he owned the home and lived at the residence with his grandson.

54.     Based on the intercepted communications in conjunction with the intelligence obtained from the court authorized phone searches, and the information provided by BRYAN, it

15

is apparent SELLERS is occupying and utilizing the residence in furtherance of the MTAM

Enterprises continued criminal conduct and a search of the residence would likely lead to the

discovery of the MTAM Enterprises criminal activities to include:

a) Cellular telephones utilized by Chase SELLERS.
b) Financial records indicating payments received.
c) Receipts for shipments of narcotics.
d) Items used to package narcotics for distribution via commercial shippers i.e. USPS, FedEx, UPS.

## 1432 FAIRWAY DRIVE
## RANTOUL, IL 61866
## (Dequan FENDERSON)

**55.**     Throughout this investigation 1432 Fairway Drive, Rantoul, IL 61866, has been

identified as the residence utilized by Dequan FENDERSON.

**56.**     As previously documented above, during the month of August 2023, DEA Agents

in Illinois were contacted by DEA Agents based in Fort Worth, Texas and advised two couriers

(hereafter referred to as CD-1 and CD2) were arranging transport of approximately 10,000 M/30

pills from Illinois to Fort Worth, TX.  The total combined weight of the suspected M/30s was

approximately 1,118.2 grams and tested positive for the presence of Phenethyl-a fentanyl analog.

**57.**     During a subsequent interview with CD-1, CD-1 revealed the 10,000-pill delivery

was initially orchestrated by fellow MTAM member Trayon PARKER.  CD-1 stated CD-1 and

PARKER went to a house near Golfview Village where PARKER's child's mother lives with an

individual named "Wop".  The residence CD-1 described is known to investigators as being

located at 1432 Fairway Drive, Rantoul, Illinois. The individual known as "Wop" has previously

been identified by investigators as Dequan FENDERSON.

**58.**     Through the monitoring of the court authorized interception of wire

communications occurring over the cellular telephone utilized by COLEMAN, more than 20

pertinent calls have been intercepted between COLEMAN and FENDERSON.

59.    A sampling of the intercepted communication which has taken place between

COLEMAN and FENDERSON is from the following exchange took place on January 30, 2024:

- COLEMAN: Yeah.
- FENDERSON: [Voices Overlap] Yo. Yeah?
- COLEMAN: Where you at?
- FENDERSON: Uh, finna go, uh, make this-- Ey, MULLA say can he get a, uh... A-, a [U/I] pint?
- COLEMAN: Tell him yeah, I'll sell him a pint.
- FENDERSON: Huh?
- COLEMAN: Tell him yeah, I got 'em. I'll sell him a pint [Background: Clattering].
- FENDERSON: Okay.
- COLEMAN: [U/I].
- FENDERSON: [Voices Overlap] What you need me to do?
- COLEMAN: Huh?
- FENDERSON: I said you need me to do something?
- COLEMAN: N-, nah. You already slid on MU?
- FENDERSON: Yeah, I slid on MU. TADOE, TADOE and MU needed one fifty (150).
- COLEMAN: One fifty (150)?
- FENDERSON: Huh?
- COLEMAN: One fifty (150)?
- FENDERSON: Yeah. Like, one fifty (150) ... of percs.
- COLEMAN: Huh?
- FENDERSON: A hundred fifty (150) percs.
- COLEMAN: Oh, bring you a hundred fifty (150) percs?
- FENDERSON: Yeah.

60.    A sampling of the intercepted communication which has taken place between

COLEMAN and FENDERSON is from the following exchange took place on February 7, 2024:

- FENDERSON: Yeah. And how many-, how many packs I'm 'posed to take today?
- COLEMAN: Uh... Packs. [U/I] 5 and, uh... Take 'em [PH].-, take 'em more than
- 5, bro. 'Cause they--, they probably, like-, they probably, like-- Hmm. [Pause] [U/I] 5... Like, 14.
- FENDERSON: 14? 14?
- COLEMAN: [Coughs] Uh-huh.
- FENDERSON: A'right.
- COLEMAN: Take all them players [PH].
- FENDERSON: A'right. [U/I].

17

61.     The following day on February 8, 2024 investigators intercepted additional communication which has taken place between COLEMAN and FENDERSON during which the following exchange took place:

- Parties greet.
- COLEMAN: What you on, [U/I]?
- FENDERSON: Just touched.
- COLEMAN: Just touched, brody?
- FENDERSON: Yeah. BLAST [PH] house.
- COLEMAN: BLAST?
- FENDERSON: You know it.
- COLEMAN: [Laughs]
- FENDERSON: Just touched down in the A [Chuckles].

62.     These intercepted communications and subsequent intercepted communications revealed FENDERSON flew to Atlanta, Georgia with a suspected $14,000.  In the subsequent intercepted communications, it was revealed COLEMAN spoke with Kevin NUNLEY who FENDERSON delivered the suspected $14,000 to.

63.     Further, on February 14, 2024, investigators monitored electronic surveillance of 1492 Fairway Drive.  During this monitoring, a black SUV was observed arriving in the driveway.  Moments later a larger black male, resembling FENDERSON's physical description, exited from the front of the residence, entered the black SUV, at which time the SUV departed. It should be noted that while the electronic surveillance does not directly show the front door of 1432 Fairway Drive, the area the male resembling FENDERSON emerged from is consistent with FENDERSON coming from 1432 Fairway Drive.

64.     During the last week of February, 2024, the Rantoul PD CS again pointed out to investigators the residence of 1432 Fairway Drive as the residence of FENDERSON.  This was done when investigators were in the vicinity of the residence and the CS without instruction guided investigators to the street, and upon driving, pointed out FENDERSON's residence as 1432 Fairway Drive.

65. Based on the intelligence provided by CD-1, the Rantoul CS, the intercepted communications, in conjunction with the monitoring of electronic surveillance for the residence it is apparent FENDERSON and the MTAM Enterprise, are utilizing the residence in furtherance of the enterprises continued criminal conduct and a search of the residence would likely lead to the discovery of the MTAM Enterprises criminal activities to include:

    **a)**    Cellular telephones utilized by Dequan FENDERSON.
    **b)**    Financial records indicating payments received.
    **c)**    Receipts for shipments of narcotics.
    **d)**    Items used to package narcotics for distribution via commercial shippers i.e. USPS, FedEx, UPS.

### 2592 WEST SPRINGFIELD AVE
### CHAMPAIGN, IL 61821
### (Trayon PARKER)

66. Throughout this investigation 2592 West Springfield Ave, Champaign, IL 61821, has been identified as the residence utilized by Trayon PARKER.

67. As previously documented above, throughout this investigation, numerous controlled purchases of both illicit and pharmaceutical narcotics have been completed from PARKER.  Additionally, the previously mentioned shipment of 10,000 fentanyl pills to Fort Worth, TX was directed and controlled by PARKER.

68. On February 1, 2024, communication was intercepted between COLEMAN and COLE in which COLEMAN directed COLE to pick up money from PARKER during which the following exchange took place:

- COLEMAN: A'right. Go get, uh, go get my money from TRAY too. Uh, from the Brooks.
- COLE: Say that again?
- COLEMAN: Go get my money from TRAY from the Brooks.
- COLE: Okay. [U/I] get money from TRAY from the Brooks. Okay. Okay, I got you, brody.

69.     Investigators subsequently monitored electronic surveillance of Country Brook Apartment Camera's and observed COLE arrive and park in front of unit 2592 West Springfield Ave.  A short time later, Investigators observed a black male in a black jacket, later confirmed to be PARKER, approach the driver side window of COLE's vehicle and begin speaking with COLE.  After speaking at the Jeep Investigators observed COLE exit the Jeep at which time COLE and PARKER walked up a set of steps and entered into unit 2592.

70.     On February 14, 2024, investigators conducted additional electronic surveillance of 2592 West Springfield Ave.  During this surveillance, numerous vehicles were observed arriving, with the occupants going into the residence, staying for a short period of time, then departing.  Your affiant knows this activity to be indicative of drug sales.  During this surveillance members of the Illinois State Police conducted traffic stops on two of the vehicles seen at the residence.  The traffic stops were for State of Illinois violations.  The first stop resulted in the driver of the vehicle fleeing on foot.  That individual was apprehended and identified as Kentrell MCFARLAND.  After MCFARLAND was taken into custody, a small clear plastic tied baggie containing a white powder (suspected cocaine), was located in the vehicle where MCFARLD had fled from.  The second traffic stop resulted in the front seat passenger attempting to exit the vehicle and flee.  This male was also apprehended, taken into custody, and identified as a juvenile male.  A search of the juvenile male resulted in the discovery of a handgun with no serial number, (often referred to as a ghost gun), as well as a prescription bottle with no readable label.  Inside the prescription bottle were 5 white circular pills found to contain the imprint (RP 10/325).  An additional single white circular pill found to contain the imprint (RP 10/325) was located in the juvenile's pant pocket.  Additionally, inside the prescription bottle was a single blue rectangular pill found to contain the imprint (B707). A check through pill identifier showed the white circular pills represented Acetaminophen and Oxycodone Hydrochloride 325mg/10mg and the blue rectangular pill represented Alprazolam

2mg.  The suspected Oxycodone Hydrochloride pills are a schedule two controlled substance, while the suspected Alprazolam pill is a schedule 4 controlled substance.

71.     Based on the intercepted communication, delivery of cash to COLE, one of COLEMAN'S co-conspirators, and the seizures of narcotics and a firearm coming from this residence it is apparent PARKER and the MTAM Enterprise, are utilizing the residence in furtherance of the enterprises continued criminal conduct and a search of the residence would likely lead to the discovery of the MTAM Enterprises criminal activities to include:

    **a)**    Cellular telephones utilized by Trayon PARKER.
    **b)**    Financial records indicating payments received.
    **c)**    Receipts for shipments of narcotics.
    **d)**    Items used to package narcotics for distribution via commercial shippers i.e. USPS, FedEx, UPS.

### 2142 MONROE DRIVE
### URBANA, IL 61802
### (Eric COLE)

72.     Throughout this investigation, 2142 Monroe Drive, Urbana, IL 61802, has been identified as the residence utilized by Eric COLE.

73.     Through the monitoring of the court authorized interception of wire communications occurring over the cellular telephone utilized by COLEMAN, more than 35 pertinent calls have been intercepted between COLEMAN and COLE.

74.     A sampling of the intercepted communication which has taken place between COLEMAN and COLE is from the following exchange took place on January 31, 2024:

- COLE: Yo.
- COLEMAN: Where you at?
- COLE: I'm at the crib.
- COLEMAN: Where?
- COLE: At the crib.
- COLEMAN: You got traffic?
- COLE: Huh? Say that again, Twin?
- COLEMAN: I said you got traffic?
- COLE: No. I'm tryna, I'm tryna get traffic now.

- COLEMAN: You gotta pick up the paper from, uh, bro.
- COLE: Say that again?
- COLEMAN: You need to pick up this paper from bro.
- COLE: Pick up paper?
- COLEMAN: [PAUSE] [U/I] from TRAY [U/I].
- COLE: I ain't hear you. Your-, your shit cut out.
- COLEMAN: I said I need you to go pick up this paper from TRAY.
- COLE: Pick up-, pick up some money from TRAY?
- COLEMAN: Yeah, in the Brooks.
- COLE: [PAUSE] He in the-, he in the Brooks?
- COLEMAN: Yeah [PH].

**75.**     During this intercepted communication COLEMAN is instructing COLE to go to PARKER's residence, at pick up a quantity of money.  Investigators intercepted multiple additional communications the following day, February 1, during which COLEMAN was again instructing COLE to pick up money from PARKER.  Investigators subsequently monitored electronic surveillance of Country Brook Apartment Cameras and observed COLE arrive and park in front of unit 2592 West Springfield Ave.  A short time later, Investigators observed a black male in a black jacket, later confirmed to be PARKER, approach the driver side window of COLE's vehicle and begin speaking with COLE.  After speaking at the Jeep, Investigators observed COLE exit the Jeep at which time COLE and PARKER walked up a set of steps and entered into unit 2592.

**76.**     On February 3, 2024, communication was intercepted between COLEMAN and COLE in which COLEMAN directed COLE to count out a quantity of drugs and ship them via FedEx during which the following exchange took place:

- COLEMAN: Yo.
- COLE: Yo.
- COLEMAN: Count 'em out?
- COLE: Huh?
- COLEMAN: Count 'em out?
- COLE: [U/I] finna take 'em [U/I].
- COLEMAN: Huh?
- COLE: I said I'm finna take 'em out there right now.
- COLEMAN: You already count 'em up, gang?

- COLE: Yeah, man. You know I'm fast with it.

77.     As the conversation continued, COLE related to COLEMAN that COLE was three minutes from FedEx.  COLEMAN instructed COLE to "do the same thing".  Investigators in conjunction with FedEx Corporate Security Partners ultimately located and identified a FedEx package shipped by Eric COLE.  The package was identified as a large FedEx Box with tracking # 2705 6446 3848 shipped by Eric COLE with a listed address of 2142 Monroe Dr, Urbana, IL 61802 and a listed recipient of Tkyah White Head. The package's destination was to a Walgreen's Store located at 18300 Governors Hwy, Homewood, IL 60430 where it was to be held for pick up.

78.     On February 5, 2024, FedEx Security transferred custody of the package to your affiant at the FBI Resident Agency, located at 2117 West Park Ct., Champaign, IL 61821.  On that same date, your affiant was issued a search warrant for the package by United States Magistrate Judge Eric Long.  Investigators subsequently executed the search warrant.  Upon opening the FedEx box, Investigators observed a plastic bag tied closed.  Inside the plastic bag was a cardboard box containing "matcha super green" tea bags, and three articles of clothing. Inside the pouch of a blue and white hooded sweatshirt your affiant located a blue latex glove with pills inside.  The pills were white circular pills and found to contain the imprint (RP 10/325).  A check through pill identifier showed the pills represented Acetaminophen and Oxycodone Hydrochloride 325mg/10mg.  These pills are a schedule two controlled substance. These pills were submitted to the DEA North Central Laboratory where the pills showed a reported weight of 164 grams and tested positive for N-Phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide (Fentanyl) (calc. as Hydrochloride), a fentanyl analogue.

79.     On February 20, 2024, the Illinois State Police conducted a traffic stop on a silver Dodge Durango bearing Illinois registration CN82234 for the passenger of the vehicle not wearing a seatbelt.  Subsequent to the stop, Kentrell MCFARLAND, Eric COLE, and Kayla

BRIGHT were identified as the occupants of the vehicle.  During their interaction with ISP, two pill bottles containing various pills, a bottle containing a purple liquid, a nitrous oxide canister and a small amount of marijuana were located.

80.    During the traffic stop, COLEMAN received a call from COLE during which the following exchange took place:

- COLE: [Voices Overlap] They got the dog up here too [U/I].
- COLEMAN: They finna try to, [U/I]. They finna try to search you. You ain't got nothing on you? Got something on you?
- COLE: Nah. Hell nah. I had the yercs on me, and the girl put 'em in her purse.
- COLEMAN: Y'all put them bitches in the [U/I]. [Pause] [U/I] put that bitch in the [U/I] in a bag. You gotta [U/I] for real. [Pause] They lookin' for guns though. I already know what they looking for. The finn-- I already told you what they [U/I].

81.    On March 13, 2024, your affiant received intelligence from investigators with the Champaign County Sheriff's Office regarding COLE.  Your affiant received information that the Champaign County Sherriff's Office responded to a domestic incident which took place at 2142 Monroe Drive, Urbana, Illinois 61802.  The reporting party stated COLE had assaulted them and further broke their phone.  Champaign County Deputies attempted to speak with COLE at the residence, however it was discovered COLE had left prior to Deputies arrival.  Deputies made contact with Roberta Jenkins who identified herself as COLE's grandmother. Jenkins stated COLE is currently living at the residence.

82.    Based on the intercepted communications, intercepted FedEx package with a listed return address of 2142 Monroe Dr, Urbana Illinois, the traffic stop resulting in the recovery of additional suspected controlled substances, and the identification of COLE residing at the residence by Jenkins, it is apparent COLE and the MTAM Enterprise, are utilizing the residence in furtherance of the enterprises continued criminal conduct and a search of the residence would likely lead to the discovery of the MTAM Enterprises criminal activities to include:

**a)**    Cellular telephones utilized by Eric COLE.
**b)**    Financial records indicating payments received.
**c)**    Receipts for shipments of narcotics.
**d)**    Items used to package narcotics for distribution via commercial shippers i.e. USPS, FedEx, UPS.

**1207 MASON CIRCLE**
**URBANA, IL 61802**
**(Martinez BRADLEY)**

**83.**    Throughout this investigation 1207 Mason Circle, Urbana, IL 61802, has been identified as the residence utilized by Martinez BRADLEY.

**84.**    During the month of August 2023, investigators with the Champaign County Street Crimes Task Force (CCSCTF) completed a controlled purchase of approximately 10 suspected fentanyl pills, which were submitted to the Illinois State Police laboratory for testing and ultimately showed the presence of fentanyl.  During this controlled purchase investigators established surveillance in the vicinity of 1207 Mason Circle.  While on surveillance a male matching BRADLEY's physical description exited the residence and entered a Nissan SUV.  The Nissan then travelled to the agreed upon meeting location where BRADLEY supplied a (CCSCTF) confidential source with the quantity of fentanyl pills.

**85.**    During the months of October, November, and December 2023, a DEA Undercover Officer met three separate times with BRADLEY to acquire quantities of blue M/30 pills and promethazine with codeine.  These meetings were arranged by the DEA UC via telephone calls and text messages with COLEMAN, in which BRADLEY would ultimately deliver the controlled substances.  These controlled substances were then submitted to the DEA North Central Laboratory for testing and analysis.  To date investigators have received some lab results which have shown the blue round M/30 pills tested positive for N-Phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide (Fentanyl) (calc. as Hydrochloride), a fentanyl analogue.

86.     Further, through the monitoring of the court authorized interception of wire communications occurring over the cellular telephone utilized by COLEMAN, more than 25 pertinent calls have been intercepted between COLEMAN and BRADLEY.

87.     A sampling of the intercepted communication which has taken place between COLEMAN and BRADLEY is from the following exchange took place on February 1, 2024:

- COLEMAN: Send that to CHASE. Cash App that to CHASE. That money I sent to you
- from TRAY.
- BRADLEY: Uh, that 125?
- COLEMAN: Yeah.
- BRADLEY: I been sent that.
- [15:23:00] COLEMAN says TRAY found out BRADLEY and others were at the store and posted on Facebook that he was going to find his own way. COLEMAN and BRADLEY talk about TRAY's Facebook post. BRADLEY talks about a third party getting into it with TRAY about exchanging $100 for airpods.
- [15:24:10] BRADLEY: So he just called last night, so WOP was like, uh, "Ask NEZ where the 10 mils at." Uh, "I need it so I can, uh, I'm finna trade it for 2 more GUNS." I'm like "Damn, niggas tryna..."
- COLEMAN: [VOICES OVERLAP] "[U/I] shit, I ain't even got no guns." I'm like "Shit, it's cool though."
- BRADLEY: [VOICES OVERLAP] on my sister, [U/I].
- COLEMAN: [VOICES OVERLAP] [U/I] guns. [U/I].
- BRADLEY: [VOICES OVERLAP] I know you do. I know you do. I know you do. [U/I]. I'm like "I don't need--." I'm like "Shit, I-, I really wanted the 10 mil." I'm like "Shit, but I don't need it."
- COLEMAN: [VOICES OVERLAP] [U/I] yeah.
- BRADLEY: I'm like, "I don't need that motherfucking 10 mil. I'm like "Shit, I can go get a GUN from brother and them, and I'll find me a new 10 mil." He like-, uh... He said something. He said something where I'm like "Shit, I ain't fucked up about nothing. Shit, I been gone for a week-,
- a week or two and I profited a 10." That's probably why he just posted that on Facebook.
- COLEMAN: Yeah. On bro, he like [U/I].
- BRADLEY: I said "I been gone-, I been gone for a week or two, and on my dead sister, I got close to a 10 at the crib in drugs."

88.     On February 20, 2024, at approximately 4:02 PM, the Illinois State Police (ISP) conducted a traffic stop on a Toyota sedan bearing Illinois registration DM88970 for a non-moving violation. Troopers made contact with the driver and identified the driver as Martinez

BRADLEY. Troopers learned there was an outstanding arrest warrant for BRADLEY. Following the conclusion of the traffic stop, troopers transported BRADLEY to the Champaign County jail. During a secondary search of BRADLEY's person, officers observed BRADLEY concealing a pill container containing several white pills.  The pills were found to be approximately 32.1 grams of white circular pills stamped RP 10/325.  A check through pill identifier showed the pills represented Acetaminophen and Oxycodone Hydrochloride, a schedule two controlled substance.  It should be noted an additional quantity of these RP 10/325 pills has been recovered throughout this investigation and lab results have shown the RP 10/325 pills tested positive for N-Phenyl-N-[1-(2-phenylethyl)-4-piperidinyl]propanamide (Fentanyl), a fentanyl analogue.

89.     During the first week of March 2024, your affiant conducted surveillance in the vicinity of 1207 Mason Circle, Urbana, Illinois 61802.  During this surveillance your affiant observed the Toyota sedan bearing Illinois registration DM88970 parked in the driveway of the residence.  This was the same Toyota which Bradley was driving during the February 20 traffic stop.

90.     On March 8, 2024, Postal Inspector Ashley Tertocha was contacted by Detective Ken Sprague with the Urbana Police Department, inquiring about individuals receiving mail at 1207 Mason Circle, Urbana, IL 61802, in preparation for an anticipated search warrant operation. Inspector Tertocha researched Postal Business Records and found that on 2/22/2024, a parcel bearing USPS tracking number 9234690248355501538613 was addressed to "Martinez Bradley" at 1207 Mason Circle and was delivered in the vicinity of the address according to geo-location information.

91.     Based on the intercepted communications, prior controlled purchases/deliveries from BRADLEY, and the traffic stop resulting in the recovery of additional suspected controlled substances it is apparent BRADLEY and the MTAM Enterprise, are utilizing the residence in

furtherance of the enterprises continued criminal conduct and a search of the residence would likely lead to the discovery of the MTAM Enterprises criminal activities to include:

a) Cellular telephones utilized by Martinez BRADLEY.
b) Financial records indicating payments received.
c) Receipts for shipments of narcotics.
d) Items used to package narcotics for distribution via commercial shippers i.e., USPS, FedEx, UPS

## 507 WEST WHITE STREET
## APT. 13
## CHAMPAIGN, IL 61820
## (Michael GIPSON)

92.     Throughout this investigation 507 West White Street, Apt. 13, Champaign, IL, 61820, has been identified as the residence utilized by Michael GIPSON.

93.     On November 13, 2023, a DEA Undercover Officer completed a controlled purchase of blue M/30 pills, which later tested positive at a DEA Laboratory for fentanyl, from Martinez BRADLEY.  During the controlled purchase BRADLEY arrived as the passenger in a silver Chevrolet Malibu bearing Illinois registration DU61074.  A check through the Illinois Department of Transportation showed the vehicle is registered to Michael GIPSON to 1302 Christopher Circle Apt. 4, Urbana, Illinois 61802.  GIPSON had previously been identified during this investigation and is a known member of MTAM.  Subsequent to the controlled purchase, your affiant provided a law enforcement image of GIPSON with identifiers hidden to the DEA UC. The UC positively identified GIPSON as the male driver in the silver Chevrolet Malibu bearing Illinois registration DU61074.

94.     On January 3, 2024, a Champaign County Street Crimes Task Force (CCSCTF) confidential source completed a controlled purchase from GIPSON.  During this controlled purchase GIPSON provided the confidential source with eight tablets of suspected 10mg Oxycodone Hydrochloride in exchange for two hundred dollars.  These pills were subsequently

submitted to the DEA North Central Laboratory for testing and analysis.  To date lab results have

not been received.

     **95.**     On February 2, 2024, communication was intercepted between COLEMAN and

GIPSON in which COLEMAN directed GIPSON to pick up a quantity of money and transfer the

money to COLEMAN via an app-based platform, during which the following exchange took

place:

- COLEMAN: Yo. What you on, brody?
- GIPSON: Not shit. Fucking had went over [U/I] from, uh, Savoy.
- COLEMAN: Okay. Bet. You tryna go slide on MU and grab this TRAY for me [U/I]?
- GIPSON: You said, huh?
- COLEMAN: You say [U/I] trying to grab this, uh, 3 from TRAY? I mean the three hundred (300) from MU for me and send it to me? [PAUSE] Can you hear me?
- GIPSON: Yeah. Where [U/I] was at, uh, brody?
- COLEMAN: At TRAY's house.
- GIPSON: A'right. I got you.
- COLEMAN: I said I was waiting on a call from him.
- GIPSON: A'ight you want me to Apple Pay it to you, right?
- COLEMAN: Uh, yeah. You can-, you can do that.
- GIPSON: Cash App, or...
- COLEMAN: Apple Pay.
- GIPSON: Okay. I'm finna call right now.
- COLEMAN: A'ight.
- GIPSON: Bet, my boy.

     **96.**     On March 8, 2024, your affiant checked open source databases which indicated

GIPSON was residing at 507 West White Street, Champaign, Illinois.  Your affiant contacted

Postal Inspector Ashley Tertocha regarding suspect Michael GIPSON in reference to this

address.

     **97.**     On or about March 8, 2024, through March 12, 2024, Postal Inspector Ashley

Tertocha reviewed Postal Business records for "Michael GIPSON".  Inspector Tertocha learned

that a Change of Address had been submitted in November of 2023 for GIPSON moving from

1302 Christopher Circle, Apt. 4 in Urbana, IL 61802 and moving to 507 W. White St., Apt. 13,

Champaign, IL 61820. Inspector Tertocha then reviewed recent USPS parcels going to 507 W. White St., Apt. 13, and found two parcels addressed to GIPSON, one in December 2023 and the other in January 2024. Both parcels show that they were delivered in the vicinity of the address according to geo-location information.

98.     On March 12, your affiant along with Det. Barnett of the Rantoul Police Department conducted surveillance of 507 West White Street.  During surveillance, investigators observed GIPSON seated in the driver seat of a black Chevrolet passenger car bearing Illinois registration EH21115 in the rear parking lot of the address.  A check through the Illinois Department of Transportation revealed the vehicle was registered to GIPSON.

99.     Based on the intercepted communications, prior controlled purchases/deliveries from GIPSON, and surveillance of GIPSON at the residence, it is apparent GIPSON and the MTAM Enterprise, are utilizing the residence in furtherance of the enterprises continued criminal conduct and a search of the residence would likely lead to the discovery of the MTAM Enterprises criminal activities to include:

a)     Cellular telephones utilized by Michael GIPSON.
b)     Financial records indicating payments received.
c)     Receipts for shipments of narcotics.
d)     Items used to package narcotics for distribution via commercial shippers i.e. USPS, FedEx, UPS

### 114 SCOTTSWOOD DRIVE
### URBANA, IL 61802
### (Deshante INGRAM)

100.     Throughout this investigation 114 Scottswood Drive, Urbana, IL 61802, has been identified as the residence utilized by Deshante INGRAM.

101.     On June 21, 2023, Investigators with the Champaign County Street Crimes Task (CCSCTF) Force executed a State of Illinois, Champaign County, search warrant on 2003 Cynthia Drive, Apt 208F, Champaign, IL 61821.  The warrant was signed by The Honorable

Judge Webber prior to its execution.  The warrant was issued for the residence subsequent to a

(CCSCTF) confidential source completing two controlled purchases from a male identified as

Alrahman M. WOODS, who resided at the residence.  Subsequent to the execution of the search

warrant, a female, identified as Christina ALLEN, was read her Miranda Warning and

subsequently provided information to investigators that a bedroom inside the residence was

regularly occupied by INGRAM.  Further, inside this bedroom investigators located an empty

Glock firearm case.  Inside the case was a State of Illinois concealed carry certificate with the

name of Deshante Cortez INGRAM on it.  Additionally, inside the bedroom investigators located

approximately $1,000 in United States Currency and approximately 1,443 blue circular pills

stamped M/30, known to often be counterfeit Percocet pills containing fentanyl.  These pills

were subsequently submitted to the Illinois State Police laboratory for testing and analysis.  The

pills subsequently tested positive for fentanyl with a reported weight of approximately 159.7

grams.

**102.**    Through the monitoring of the court authorized interception of wire

communications occurring over the cellular telephone utilized by COLEMAN, more than 20

pertinent calls have been intercepted between COLEMAN and INGRAM.

**103.**    On January 30, 2024, investigators monitored intercepted communication

between COLEMAN and fellow MTAM member Dequan FENDERSON.  During this

communication, COLEMAN instructed FENDERSON to supply INGRAM with a quantity of

"percs", known throughout this investigation to reference counterfeit Percocet pills containing

fentanyl.  During the intercepted communication the following exchange took place:

- COLEMAN: N-, nah. You already slid on MU?
- FENDERSON: Yeah, I slid on MU. TADOE, TADOE and MU needed one fifty (150).
- COLEMAN: One fifty (150)?
- FENDERSON: Huh?
- COLEMAN: One fifty (150)?

- FENDERSON: Yeah. Like, one fifty (150)... of percs.
- COLEMAN: Huh?
- FENDERSON: A hundred fifty (150) percs.
- COLEMAN: Oh, bring you a hundred fifty (150) percs?
- FENDERSON: Yeah.

**104.** On January 31, investigators monitored intercepted communication between

COLEMAN and INGRAM discussing INGRAM's distribution of pills during which the

following exchange took place:

- COLEMAN: What y'all on though?
- INGRAM: Shit, not shit. I think his ass [U/I].
- COLEMAN: [U/I] I don't know what they talkin' 'bout, bro.
- INGRAM: Shit, they--
- COLEMAN: [Voices Overlap] [U/I] real pharmaceutical [U/I]. That's why they-, that's why
- they look like that. Them the real pharmaceuticals.
- INGRAM: [Voices Overlap] I totally try to convince they ass.
- COLEMAN: [U/I]?
- INGRAM: [Aside: It's KIDD. It's KIDD.] TAYMO say "What's up?"
- COLEMAN: Tell him I say "What's the word?" But you say you finna move on it, though?
- INGRAM: No. I said I sure did try to convince they ass.
- COLEMAN: Damn, bro. That shit moving fast [U/I].
- INGRAM: You said huh?
- COLEMAN: That shit been moving fast [U/I]?
- INGRAM: Nah. I ain't-, I ain't been to go get 'em yet.
- COLEMAN: You ain't move none?
- INGRAM: Yeah. [Audio Glitch] [U/I]. I sit and damn near count how much I-, shit...
- COLEMAN: [Voices Overlap] I'm finna come back--
- INGRAM: [Voices Overlap] I probably sell, like, 20, 25 of that shit.
- COLEMAN: [U/I] finna come back with the other ones. You got complaints? They said they weak?
- INGRAM: Uh, one of mine had said they not hitting hard-, hard like the other ones. They stuck on the color shit.
- COLEMAN: Yeah. The color-, that's a different color. That's what they on.
- INGRAM: Yeah.
- COLEMAN: [U/I] That's really-, if you search up perc, that's really the color of the pharmaceuticals.

105.    On February 7, and February 8, 2024, a vehicle registered to INGRAM was observed parked at 114 Scottswood Drive, Urbana, IL 61802. This vehicle is a grey Chevrolet passenger car bearing Illinois registration EH21536.

106.    On February 20, 2024, investigators conducted surveillance of INGRAM who was observed driving the vehicle and meeting with multiple people for short periods of time. Your affiant, through training and experience, knows this activity and short-term meetings is indicative and consistent with narcotics sales.

107.    On the mornings of March 11 and March 12, investigators conducted surveillance of the residence at 114 Scottswood Drive. On each of these dates INGRAM's vehicle was observed parked in the driveway.

108.    At approximately 9:16pm on March 12, 2024, a Champaign County Sheriff's Office Patrol Sergeant observed INGRAM's vehicle again parked in the driveway. At that time the Patrol Sergeant made contact with INGRAM at the residence to attempt to verify this was INGRAM's residence. Upon making contact with INGRAM, the Sergeant related a ruse story that there had been a driving complaint about INGRAM and his vehicle in the neighborhood. The Sergeant also noted upon making contact at the front door of the residence there was the strong odor of burned marijuana coming from the residence. As INGRAM spoke with the Sergeant there were three additional unknown black males also present. The Sergeant related to INGRAM to simply watch his driving in the area. Prior to departing, the Sergeant attempted to confirm with INGRAM the 114 Scottswood residence was where he was staying. INGRAM initially claimed he was homeless at which time the Sergeant inquired about where INGRAM would receive mail. At that time, one of the unidentified males stated that INGRAM receives male at the residence and to just tell the Sergeant this was his residence.

109.    Based on the intercepted communications, prior recovered fentanyl pills from INGRAM, surveillance of INGRAM, and contact with INGRAM at the residence it is apparent

33

INGRAM and the MTAM Enterprise, are utilizing the residence in furtherance of the enterprises continued criminal conduct and a search of the residence would likely lead to the discovery of the MTAM Enterprises criminal activities to include:

a)    Cellular telephones utilized by Deshante INGRAM.
b)    Financial records indicating payments received.
c)    Receipts for shipments of narcotics.
d)    Items used to package narcotics for distribution via commercial shippers i.e. USPS, FedEx, UPS

### AFFIANT'S TRAINING AND EXPERIENCE

110.    Your Affiant knows, based on knowledge, training, and experience, that:

a)  individuals involved in these types of illegal activities often place assets in names other than their own to avoid detection of these assets by government and law enforcement agencies;

b)  individuals involved in these types of illegal activities often place assets in the names of business/corporate entities as nominee title holders in order to avoid detection of these assets by government and law enforcement agencies;

c)  even though these assets are placed in the names of other persons or entities, the individuals involved in these types of illegal activities actually own and continue to use these assets and exercise dominion and control over them;

d)  drug traffickers must maintain and have quick access to large amounts of United States currency or other liquid assets in order to maintain and finance their ongoing drug business;

e)  drug traffickers will attempt to legitimize the profits from illegal drug transactions by using domestic banks and their attendant services (i.e., safe deposit boxes, securities, cashier's checks, money drafts, letters of credit, brokerage houses, real estate, shell corporations and business fronts);

f)  federal courts have universally recognized that an unexplained increase in wealth is probative evidence of crimes motivated by greed; in particular, trafficking in controlled substances;

g)  It is common for drug traffickers to structure deposits and withdraws to and from bank accounts in order to avoid detection by law enforcement agencies and internal bank security departments and to disguise the source of and purposes for the funds contained in the bank accounts individuals involved in these types of illegal activities often place assets in names other than their own to avoid detection of these assets by government and law enforcement agencies;

h)  individuals involved in these types of illegal activities maintain in their residences and/or business establishments computerized or written books, records, receipts, diaries, notes, ledgers, airline tickets, cashier's checks, money orders and other papers relating to the frauds being perpetrated as well as relating to the transportation, ordering, sale and distribution of controlled substances and the outstanding debts and collections from controlled substances that have been distributed;

i)  drug traffickers commonly provide controlled substances on consignment sale to their customers, who subsequently pay for the drugs after reselling said drugs.  Therefore, the above-mentioned books, records, receipts, notes, ledgers, etc., will be secured by the drug traffickers within their residences and/or their businesses for their ready access to them for the purpose of determining drug debts and collecting moneys derived from the sale of drugs;

j)  drug traffickers commonly conceal contraband, proceeds of drug transactions, records of these transactions, and records reflecting names, nicknames,

35

addresses and telephone numbers of drug associates within their residence and/or place of business, their vehicles, the curtilage of their residence or business, and in storage facilities for ready access and to hide them from law enforcement agencies;

k) drug traffickers commonly maintain records reflecting names, nicknames, addresses and telephone numbers of both their current and past drug associates;

l) drug traffickers will commonly conceal within their vehicles, residence or businesses, within the curtilage of their residence or businesses, and in storage facilities caches of drugs, large amounts of currency, firearms, financial instruments, precious metals, precious gemstones, jewelry, electronic equipment, and other items of value and/or proceeds of drug transactions and evidence of financial transactions relating to obtaining, transferring, secreting, or spending large sums of money made in drug trafficking activities;

m) drug traffickers often have photographs or video movies of themselves, their co-conspirators and the property and assets purchased with drug proceeds.  Additionally, these photographs and videos often depict the drug trafficker and his associates ingesting and/or possessing controlled substances.  These photographs and video movies are normally in the drug trafficker's possession, their residence and/or their place of business;

n) it is common for drug traffickers to travel to major drug distribution centers, such as Florida, North Carolina, Georgia, New York, California and states near the U.S./Mexico border, in order to purchase controlled substances.  Your affiant knows that after purchasing controlled substances, drug traffickers will transport the drugs or cause them to be transported to

those areas in which they will be distributed.  Your affiant knows that drug

traffickers' methods of transporting drugs include but are not limited

to:  commercial airlines, private motor vehicles, and government and contract

mail carriers.  Your affiant knows that the vehicles, residence or business

locations of drug traffickers will often contain records of drug-related

travel.  These records may include airline ticket receipts, credit card receipts,

car rental receipts and luggage tags reflecting points of travel;

o)  based upon your affiant's training and experience, drug traffickers commonly

have firearms in their possession (on their person, at their residence, at their

business, at storage facilities, and/or their vehicles) including but not limited

to, handguns, rifles, shotguns, machine guns, and silencers.  These firearms

are most often used and/or maintained in order to protect and secure a drug

trafficker's illicit activity and property;


## **CONCLUSION**

**111.**    Based on the aforementioned factual information, I respectfully submit that there

is probable cause to believe that evidence, fruits, and instrumentalities of violations, or attempted

violations, of (1) Title 21 United States Code, Section 841(a)(1), Unlawful Distribution of

Controlled Substances,  (2) Title 21, United States Code, Section 846, Attempt or Conspiracy to

Unlawfully Distribute Controlled Substances, (3) Title 21, United States Code 843(b) use of

communication facilities to facilitate drug-trafficking offenses, may be located in the **SUBJECT**

**RESIDENCES** described in Attachment A.

## **REQUEST TO FILE UNDER SEAL**

**112.**    I further request that this Court seal the warrant and the affidavit and application in support thereof, except that copies of the warrant in full or redacted form may be maintained by the United States Attorney's Office and may be served on Special Agents and other investigative and law enforcement officers of the Drug Enforcement Administration and other investigative and law enforcement officers, and other government and contract personnel acting under the supervision of such investigative or law enforcement officers, as necessary to effectuate the warrant. These documents pertain to and discuss an ongoing criminal investigation that is neither public nor known to all the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize the investigation. Sealing these documents will also better ensure the safety of agents and others.

**113.**    I further state that I have verified and have knowledge of the facts alleged in this affidavit and that they are true and correct to the best of my knowledge.

Respectfully submitted,

MATTHEW NOLA Digitally signed by MATTHEW NOL
Date: 2024.03.18 13:52:23 -05'00'

Matthew T. Nolan
Special Agent
Drug Enforcement Administration

Subscribed and sworn to before me on this __19__ Day
Of March 2024.

s/ Eric I Long

UNITED STATES MAGISTRATE JUDGE

**Attachment A**

**Property to be Searched**

The **SUBJECT PREMISES** is described as **1732 Gleason Drive, Rantoul, IL 61866**.  The property located at 1732 Gleason Drive is located on the east side of Gleason Drive in the city of Rantoul, Illinois. The property contains a single-story residence with yellow and green siding, one exterior door facing Gleason Drive and a single stall attached garage. The words "Seventeen Thirty Two" are displayed directly over the single car gar.







## **ATTACHMENT B**

### **Items to be seized**

Evidence relating to violations of Title 21 United States Code Section 841, possession with intent to distribute controlled substances and Title 21 United States Code Section 846, Conspiracy to possess with intent to distribute a controlled substance. Specifically:

1. Controlled substances, as well as paraphernalia used in the manufacture, preparation, packaging, or weighing of illegal narcotics in preparation for distribution;

2. Illegal Firearms and ammunition;

3. Records of narcotics transactions including, but not limited to, books, ledgers, receipts, notes, and other papers relating to the manufacture, transportation, possession, and distribution of controlled substances;

4. Financial records and other records or documents reflecting narcotics-trafficking activity or the disposition of narcotics proceeds, including, but not limited to, currency, bank checks, cashier's checks, Western Union receipts, money orders, stocks, bonds, precious metals, and real estate records;

5. Records that identify other co-conspirators, including, but not limited to: address books, telephone books, rolodexes, telephones, pagers, cellular telephones, or personal digital assistants with stored telephone information, notes reflecting telephone and pager numbers, photographs (to include still photos, negatives, movies, slides, video tapes, and undeveloped film), and audiotape recordings of conversations, including those made over telephone answering machines;

6. Documents or other records relating to state court proceedings involving other co-conspirators, including, but not limited to, charging documents and bail records;

7. Identification documents;

8. Records of travel including, but not limited to, tickets, transportation schedules, passports, notes and receipts related to travel, and motel/hotel receipts;

9. Indicia of occupancy, residency, and/or ownership of the premises, including keys, photographs, or documents;

10.  Safes, combination or key-lock strong boxes or other secure storage containers, suitcases, locked cabinets and other types of locked or closed containers, and hidden compartments that may contain any of the foregoing;

11.  Electronic equipment, such as computers, facsimile machines, currency county machines, telephone answering machines, cellular telephones, personal digital assistant, to include the stored electronic data contained in those devices.  Any and all information and/or data stored in the form of magnetic or electronic coding on computer media or on media capable of being read by a computer or with the aid of computer related equipment.  This media includes, but is not limited to floppy disks, fixed hard drives, removable hard disk cartridges, compact disks, tapes laser disks, video cassettes, and any other media that is capable of storing magnetic coding.  Any and all electronic devices which are capable of analyzing, creating, displaying, converting, or transmitting electronic or magnetic computer impulses or data.  These devices include, but are not limited to, computers, computer components, computer peripherals, word processing equipment, modems, monitors, printers, plotters, encryption circuit boards, optical scanners, external hard drives, and other computer related electronic devices.